2005 OK CR 10

**Curtis Edward McCARTY, Appellant**

v.

**STATE of Oklahoma, Appellee.**

**No. PCD–2002–1493.**

Court of Criminal Appeals of Oklahoma.

June 14, 2005.

John David Echols, Tulsa, OK, Vicki Ruth Adams Werneke, Oklahoma Indigent Defense System, Norman, OK, attorneys for Petitioner on appeal.

W.A. Drew Edmondson, Attorney General, Seth S. Branham, Asst. Attorney General, Oklahoma City, OK, attorney for the State.

### OPINION GRANTING APPLICATION FOR POST–CONVICTION RELIEF

LUMPKIN, V.P.J.

¶ 1 Petitioner Curtis Edward McCarty was tried and convicted of First Degree Murder in the District Court of Oklahoma County, Case No. CRF–85–2637. He was sentenced to death. However, on appeal this Court reversed and remanded for a new trial, finding the record "replete with error committed during both stages of the trial. . . ." *McCarty v. State,* 1988 OK CR 271, 765 P.2d 1215, 1222.

¶ 2 Petitioner was retried in 1989. For a second time, he was convicted of First Degree Murder and sentenced to death. On appeal we affirmed Petitioner's murder con-

viction, but reversed his death sentence and remanded for resentencing because the trial court had refused to instruct the jury on the requested alternative sentencing option of life imprisonment without parole. *McCarty v. State*, 1995 OK CR 48, 904 P.2d 110.

¶3 Petitioner's resentencing proceeding was held in 1996, and Petitioner was sentenced to death for a third time. This Court affirmed his sentence in *McCarty v. State*, 1998 OK CR 61, 977 P.2d 1116 and denied rehearing in *McCarty v. State*, 1998 OK CR 18, 977 P.2d 1116. Petitioner filed for post-conviction relief, but we denied relief. *McCarty v. State*, 1999 OK CR 24, 989 P.2d 990.

¶4 In September of 2003, Petitioner, through counsel, filed his second application for post-conviction relief and request for evidentiary hearing, seeking reversal of his

1. The allegations predominantly revolve around the now notorious actions of former Oklahoma City Police Chemist Joyce Gilchrist.

2. Petitioner later filed a lengthy *pro se* motion in which he raised various claims against his appellate counsel, including ineffective assistance, incompetence, conspiracy, and fraud.

3. (1) Did the State of Oklahoma have knowledge of, suppress, or neglect to share with defense counsel lab documents and altered lab notes proving Petitioner had been excluded by Ms. Joyce Gilchrist as a donor of all crime scene hairs in 1983? (2) Did the State of Oklahoma have knowledge of, suppress, or neglect to share with defense counsel evidence that proves Ms. Gilchrist's forensic testing in Petitioner's case was not peer reviewed? (3) Did the State of Oklahoma have knowledge of, suppress, or neglect to share with defense counsel evidence of flawed serological evidence and false testimony? (4) Did the State of Oklahoma have knowledge of, suppress, or neglect to share with defense counsel evidence that Ms. Gilchrist had not completed her yearly proficiency tests? (5) Did the State of Oklahoma have knowledge of, suppress, or neglect to share with defense counsel exculpatory evidence, in violation of *Brady v. Maryland, Giglio v. United States,* and/or *Kyles v. Whitley?* (6) What entities participated in the Oklahoma City Police Departmental Review Board and by what authority was it created? (7) Based upon the findings and conclusions with respect to questions 6, are the findings of the OCPD Review Board with respect to its investigation of Ms. Joyce Gilchrist binding admissions against the State of Oklahoma? If so, what are those findings? (8) Has critical evidence in Petitioner's case been destroyed or lost? (9) If so, was such evidence destroyed or lost by agents of the State of Oklahoma, acting in bad faith? (10) Also, to

murder conviction and death sentence on the basis of suppression of exculpatory evidence and bad faith by the State of Oklahoma,[1] due process denial, and factual innocence.[2] Later, the State filed responses in which it waived procedural bars and consented to an evidentiary hearing on several of Petitioner's claims "due to the serious allegations raised."

¶5 In April of 2004, this Court remanded the case for an evidentiary hearing on the post-conviction issues raised. We listed sixteen specific questions to be resolved at the evidentiary hearing,[3] in addition to certain *pro se* questions raised concerning the matter of Petitioner's legal representation.[4] All of these matters were capably adjudicated in hearings before the Honorable Twyla Mason Gray, Oklahoma County District Court Judge, in early October of 2004.[5]

what extent was such evidence previously turned over to defense counsel for analysis and submission to a defense expert? (11) Did Ms. Gilchrist's hair comparison testimonial evidence in Petitioner's trial go beyond the acceptable limits of forensic science? (12) Was defense counsel aware of the limits of proper testimony and have the ability and resources to impeach the testimony at trial? (13) Was the hair evidence now challenged by Petitioner sent to a defense expert in California prior to Petitioner's 1989 re-trial, and, if so, was a report of that expert's conclusions provided to the defense? (14) What resources were available to the defense to develop that evidence at re-trial and what was the trial strategy for its use? (15) Do newly discovered DNA test results exonerate Petitioner? (16) Considering the answers to the questions above, did Petitioner receive a fair trial and resentencing hearing?

4. Petitioner raised issues of ineffective assistance, incompetence, conspiracy, and fraud against his post-conviction counsel and the Oklahoma Indigent Defense System. He claimed his counsel had violated the attorney-client privilege and indicated he would not communicate with his counsel due to a "complete breakdown" in the attorney-client relationship.

5. Concerning the *pro se* matters raised over the matter of Petitioner's representation, Judge Gray found Petitioner "has a long history of being dissatisfied with various court-appointed counsel." Judge Gray also found Petitioner's post-conviction counsel had not violated the attorney-client privilege. She thus refused to remove said attorney from representing Petitioner at the remanded evidentiary hearing. (This ruling impliedly resolved the question we had posed, i.e.,

¶ 6 Judge Gray filed her very thorough findings of fact and conclusions of law with this Court on November 16, 2004. Thereafter, following completion of the district court's record of these proceedings, we received supplemental briefs by both parties in the last week of January 2005.

■ ¶ 7 Before considering Petitioner's claims, we reiterate the narrow scope of review available under the amended Post–Conviction Procedure Act. The Act was neither designed nor intended to provide applicants another direct appeal. *Walker v. State,* 1997 OK CR 3, ¶ 3, 933 P.2d 327, 330, *cert. denied,* 521 U.S. 1125, 117 S.Ct. 2524, 138 L.Ed.2d 1024. The Act provides petitioners with very limited grounds upon which to base a collateral attack on their judgments. Under 22 O.S.2001, § 1089(C)(1), only claims that "[w]ere not and could not have been raised in a direct appeal" will be considered.[6] Should a Petitioner meet this burden, this Court shall consider the claim only if it "[s]upports a conclusion either that the outcome of the trial would have been different but for the errors or that the defendant is factually innocent." 22 O.S.2001, § 1089(C)(2).

■ ¶ 8 In proposition one, Petitioner contends the suppression of exculpatory evidence and introduction of false testimony by the prosecution rendered his conviction unconstitutional and denied him due process of law and a fair trial as guaranteed by the Fifth and Fourteenth Amendments.[7] Petitioner claims the State and its agents suppressed lab documents and altered lab notes proving Oklahoma City Police Chemist Joyce Gilchrist had excluded Petitioner as a donor of all crime scene hairs in 1983.[8] He claims Ms. Gilchrist's written report and trial testimony were false and materially misleading.[9] He also claims the prosecution and its agents suppressed exculpatory evidence that proved none of Ms. Gilchrist's forensic testing in Petitioner's case was peer reviewed, contrary to the testimony at trial. He also claims the prosecution and its agents failed to disclose that Ms. Gilchrist's serology analysis in Petitioner's case was flawed and her testimony was false.[10] And finally, he claims the prosecution and its agents failed to disclose that Ms. Gilchrist had not completed yearly proficiency tests, contrary to her testimony at trial.

whether there had been a complete breakdown in communication between Petitioner and his post-conviction counsel.) Judge Gray found, however, that a misunderstanding had taken place between Petitioner and his post-conviction counsel, a misunderstanding Petitioner had helped to create. As a result, a schism had developed that Petitioner had no desire to heal. Out of an abundance of caution, Judge Gray appointed John Echols to represent Petitioner at the evidentiary hearing, but with continued assistance from post-conviction counsel, Vicki Werneke of OIDS. Mr. Echols consented to and was in favor of Ms. Werneke's assistance, despite Petitioner's continued objections. We find no fault with any of these rulings.

6. A capital post-conviction claim could not have been raised on direct appeal if: (1) it is an ineffective assistance of trial or appellate counsel claim which meets the statute's definition of ineffective counsel; or (2) the legal basis of the claim was not recognized or could not have been reasonably formulated from a decision of the United States Supreme Court, a federal appellate court or an appellate court of this State, or is a new rule of constitutional law given retroactive effect by the Supreme Court or an appellate court of this State. A factual basis of a claim is unavailable on or before a date described ... if the factual basis was not ascertainable through the

exercise of reasonable diligence on or before that date. 22 O.S.2001, § 1089(D).

7. The State expressly waived any procedural bars that may arguably apply to proposition one.

8. Petitioner claims Ms. Gilchrist's lab notes and handwritten notes initially excluded him as donor of the crime scene hairs, but then were changed or altered by Ms. Gilchrist to reflect the hairs were consistent with his, after Petitioner was charged with murder.

9. At trial, Ms. Gilchrist testified sixteen scalp hairs and one pubic hair found at the crime scene were microscopically consistent with hair obtained from Petitioner, including a pubic hair found on the victim's chest and a scalp hair found on the knife wound in the victim's chest.

10. Appellant argues Ms. Gilchrist failed to obtain P–30 protein tests that would have narrowed the field of possible semen donors to certain blood types. Ms. Gilchrist testified a Type A male contributed the crime scene semen and only 30% of the population is type A. But because her P–30 testing failed, Appellant claims the only scientifically correct conclusion that could be drawn from her testing was the semen donor could have been any male in the population.

¶ 9 Petitioner claims Ms. Gilchrist's actions and the prosecution's actions violated *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and *Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). He supports his claims with various documents, including copies of Ms. Gilchrist's lab reports and handwritten notes and findings made by the Oklahoma City Police Departmental Review Board (the "Review Board").[11]

¶ 10 Closely related to the issues raised in proposition one, Petitioner's second proposition claims he has been denied due process because the State of Oklahoma demonstrated bad faith in the "apparent destruction of evidence."[12] He claims this destruction of evidence precluding mtDNA testing, which would have proven his actual innocence.[13]

¶ 11 The remanded evidentiary hearing squarely addressed the issues Petitioner raises in propositions one and two, and the District Court made detailed findings and conclusions with respect to each.[14] While we will not set forth all of those findings and conclusions here, they can be generally summarized and grouped into three categories: (1) there was no competent evidence *admitted at the evidentiary hearing* that the State or any of its agents (excluding Ms. Gilchrist) intentionally suppressed, neglectfully failed to share, or intentionally destroyed exculpatory evidence or knowingly sponsored false testimony regarding Ms. Gilchrist's findings, opinions, and qualifications;[15] (2) Ms. Gilchrist, while acting as an agent of the State and in relation to her role as an expert in Petitioner's case, withheld evidence, *most likely* lost or intentionally destroyed important and potentially exculpable (or incriminating) evidence,[16] provided flawed laboratory analysis and documentation of her work, testified in a manner that exceeded acceptable limits of forensic science, and altered lab reports and handwritten notes in an effort to prevent detection of misconduct; and (3) as a result of Ms. Gilchrist's actions, Petitioner did not receive a fair trial and resentencing proceeding.

¶ 12 The record adequately supports these

---

11. Oklahoma City's Police Chief convened the Review Board after Ms. Gilchrist filed a grievance objecting to misconduct charges alleged by her supervisor. After she was fired, she filed a wrongful termination lawsuit in Federal Court. The city used the Review Board's findings to defend the suit, and a federal judge found Ms. Gilchrist had failed to prove any of the Review Board's conclusions were wrong. The Review Board's findings encompass Ms. Gilchrist's lab management and actions in several criminal cases, including Petitioner's. Judge Gray ruled that the Review Board's findings are binding admissions against the State. We agree.

12. Petitioner points to an order entered by an Oklahoma County District Court Judge on January 12, 1999, which granted the State's application to remove evidence in several cases, including Petitioner's, because the evidence was "no longer needed, based on mandates having been issued pertaining to ... the cases, or the appeals have been abandoned." (Mandate issued on Petitioner's resentencing appeal in May of 1999, but our opinion was handed down in November of 1998.) Be that as it may, an Oklahoma County Assistant District Attorney apparently received the evidence in March 9, 1999. Within a month, Joyce Gilchrist sent a memo to an Assistant Attorney General indicating she was in possession of the evidence and that there was sufficient hair evidence to conduct DNA analysis. However, two months later, Ms. Gilchrist indicated the evidence was missing. The Review Board found the circumstantial evidence indicated Ms. Gilchrist had destroyed the evidence in order to prevent DNA testing.

13. The State expressly waived any procedural bars that may arguably apply to proposition two.

14. We commend Judge Gray for her efficiency in adjudicating these complicated issues. We recognize the extra burden placed on judges of the District Court, already seeking to manage a crowded docket, when cases of this type are remanded for evidentiary hearings. However, this Court must rely on the trial judges of this state to provide the evidentiary record from which decisions on appeal can be made. Judge Gray has performed admirably and professionally in addressing the issues remanded to her.

15. That is not to say such evidence does not exist or that the issue of who knew what and when has been forever resolved by this opinion. (See below.)

16. The State admits slides containing the pubic hair from the victim's chest and scalp hair found in the chest wound (items 39 and 40) and four folders of hair slides collected are missing. Ms. Gilchrist was the last person known to be in possession of items 39 and 40.

findings and conclusions.[17] This Court affords great deference to a District Court's findings and conclusions on such remanded evidentiary hearings, and here we find no abuse of discretion in relation thereto. *Patterson v. State*, 2002 OK CR 18, ¶ 19, 45 P.3d 925, 930; *Young v. State*, 2000 OK CR 17, ¶ 109, 12 P.3d 20, 48; *DeLozier v. State*, 1998 OK CR 76, ¶ 57, 991 P.2d 22, 33.

¶ 13 We recognize the parties sharply disagree about the State's complicity in (or conscious disregard of) Ms. Gilchrist's actions. Petitioner's attorneys are adamant that the State should have known or were on notice regarding deficiencies in Ms. Gilchrist's opinions and scientific techniques. For example, this Court was extremely critical of Ms. Gilchrist's efforts in Petitioner's first murder trial, and reversed the conviction based almost entirely on her delay and neglect, intentional or neglectful omissions, and improper expert opinions. *McCarty v. State*, 1988 OK CR 271, ¶ 4–10, 765 P.2d 1215, 1217–20.[18] We noted similar problems in other cases. *See e.g., McCarty v. State*, 1995 OK CR 48, 904 P.2d 110, 116, 126 (finding one instance of opinion bordering on impropriety and other instances that the defense attacked as to credibility on cross-examination and were thus within the jury's province); *Mitchell v. State of Oklahoma*, 1994 OK CR 70, ¶ 29, 884 P.2d 1186, 1198 (noting Gilchrist's censure by

a professional organization was "highly relevant and exactly the sort of evidence which would be of interest to a jury in determining her credibility."); *Miller v. State*, 1991 OK CR 6, ¶ 9, 809 P.2d 1317, 1320 (significant omissions in Gilchrist's forensic reporting resulted in a trial by ambush and required reversal); *Pierce v. State*, 1990 OK CR 7, 786 P.2d 1255, 1259–60 (Gilchrist's credibility attacked by defense witness thereby making the allegation of improper expert testimony a question for the jury to resolve); *Fox v. State*, 1989 OK CR 51, ¶ 39, 779 P.2d 562, 571 (improper expert opinion found harmless because it was exposed on cross-examination).

¶ 14 Of course, to the extent that the prosecution was "on notice" of these matters, so was the defense.[19] Indeed, following our decision in Petitioner's first trial, it can be safely said that the entire legal community was on notice that this Court was not particularly impressed with Ms. Gilchrist's hair comparison techniques and unscientific opinions in relation to Petitioner.[20]

¶ 15 While the issue of who knew or should have known what in relation to Ms. Gilchrist's opinions and credentials is fascinating and probably forever debatable (and the subject of pending litigation against Ms. Gilchrist and former Oklahoma County District Attorney Bob Macy), it is not necessary to

---

17. The record is more than adequately supported by numerous findings of the Review Board, pertaining to Ms Gilchrist, including: dishonesty in communications with her supervisor; mishandling evidence and case files as laboratory supervisor; failing to follow proper peer review procedures; testifying in a manner that resulted in criticism of her work in the field of forensic science; and engaging in flawed and improperly documented casework analysis.

18. We were "greatly disturbed" by allegations Ms. Gilchrist may have been pressured to give expert opinion beyond scientific capabilities, but the record did not permit us to find the prosecutors knowingly used false or misleading evidence. *Id.*, 1988 OK CR 271, ¶ 9, 765 P.2d at 1219.

19. The State points out Petitioner retained an expert to examine the physical evidence prior to Petitioner's 1989 trial. The expert reviewed the hair evidence before trial and found item 40 (now missing) was "similar to the head hair of the defendant." But defense counsel did not call the expert at trial because counsel felt he could effectively impeach Ms. Gilchrist on her account-

ing of the numbers and types of hairs found and the limitations on microscopic hair analysis. The State thus argues, "[D]efense counsel were fully aware of the limits of proper hair comparison testimony and had the ability and resources to impeach Ms. Gilchrist's testimony." Furthermore, defense counsel did in fact impeach Gilchrist regarding these matters. However, Judge Gray voiced serious doubts concerning whether or not Gilchrist sent the proper evidence to the defense: "[T]his Court cannot conclude that the slides marked # 39 and # 40 consistently contained the same samples." Judge Gray agreed with the Review Board's conclusion that Gilchrist added hairs to item 39 to incriminate Petitioner, stating she was concerned that the samples sent to the defense expert "were contaminated either deliberately or accidentally."

20. We tend to agree with Judge Gray's finding that "criminal defense attorneys had suspicions about Ms. Gilchrist's work, but no one could have guessed the full extent of her deeds."

resolve that issue here.[21] We are concerned here with whether or not *Petitioner* received a fair trial and sentencing proceeding, and Ms. Gilchrist's actions alone warrant a new trial.[22] *See Brady v. Maryland,* 373 U.S., at 87, 83 S.Ct. 1194 ("[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.")

¶ 16 In proposition three, Petitioner claims his trial was rendered fundamentally unfair when the trial court allowed exhibits and testimony concerning results of forensic hair comparisons performed by Joyce Gilchrist. This proposition is now moot, considering the relief granted with respect to propositions one and two.

■ ¶ 17 In proposition four, Petitioner claims recent DNA testing[23] confirms he is innocent of Pamela Willis's murder.[24] In proposition five, he claims recent developments in this case (Joyce Gilchrist's actions with respect to the hair and serology evidence) render the evidence presented at trial insufficient to support Petitioner's conviction for first-degree murder.

¶ 18 The State, however, claims the DNA tests do not exonerate Petitioner, stating "at best, these findings ... only exclude him as the source of the seminal fluid from the vaginal slide."[25] Furthermore, the State correctly points out that Petitioner had previously challenged the State's theory that a sexual assault had even occurred. Indeed, in our opinion in Petitioner's trial on guilt or innocence, we specifically noted defense counsel "was effective in eliciting from the experts testimony which indicated that the evidence of sexual activity did not absolutely support the conclusion that the victim had been sexually assaulted." *McCarty,* 1995 OK CR 48, ¶ 63, 904 P.2d at 127. Because we found there was no "conclusive evidence that a rape or sodomy occurred,"[26] the fact that the semen did not prove to be Petitioner's is hardly proof that Petitioner is innocent of murder.

¶ 19 The District Court reached a similar conclusion. Following the evidentiary hearing, Judge Gray ruled:

> [T]he DNA tests do not exonerate Defendant, however they do show that it is not Defendant's sperm found in and on the victim ... That Defendant's DNA was not found in the vaginal sample does not exonerate Defendant but it is certainly another piece of evidence from which the finder of fact can evaluate the totality of the evidence ... That the Defendant *was not* the individual who left sperm in and on the victim would have changed the State's theory of the case and would have been critical to the jury.

We agree.[27] If Petitioner acted with an accomplice, as theorized and argued at trial,

---

**21.** The District Court correctly found this case should not be viewed as "the definitive work on Ms. Gilchrist's career."

**22.** We have an adversarial system, which, to a certain degree, anticipates that both the prosecution and the defense will call the best available expert to support their particular theories or rebut those offered by their opponent. While allegations of a countywide conspiracy certainly is an "attention getter", the record here offers little evidence to support that point.

**23.** In December of 2001, the Medical Examiner's office found a vaginal slide taken from the victim's body that contained a sperm fraction. The slide was never released to Ms. Gilchrist or the Oklahoma City Police Department lab, so contamination was not an issue.

**24.** The State expressly waived reliance on any procedural bar that may apply to this issue.

**25.** The State originally argued the DNA test results merely indicate that "if there is a single contributor other than Pamela Willis" then Petitioner may be excluded as a possible contributor of the minor DNA profile foreign to Pam Willis. The State claimed its theory at trial was that Petitioner acted with an accomplice in the rape and murder. Thus, the State argued, "if there are more than one contributors in the sample other than the victim, Petitioner cannot be eliminated as a contributor." Following the evidentiary hearing, however, the State appears either to have abandoned this argument or at least backed away from it.

**26.** *McCarty,* 1995 OK CR 48, ¶ 62, 904 P.2d at 127.

**27.** Petitioner argues the State "abandoned" its John Doe theory during the April 1996 resentencing trial. We disagree with this argument, based on the entirety of the record. Moreover,

the absence of his sperm on the victim (assuming the victim was raped by the person or persons who killed her) is not, in and of itself, exculpatory. But it is quite relevant. Proposition four thus fails.

¶ 20 Concerning proposition five, sufficiency of the evidence, Petitioner and the State vigorously disagree about whether or not the remaining evidence, i.e., the evidence left over after the compromised hair comparison and serology evidence is taken out of the equation, is sufficient to sustain Petitioner's first-degree murder conviction.

¶ 21 The State pieces through all the circumstantial evidence and states, "even without the serology and hair evidence offered by Joyce Gilchrist, sufficient evidence, taken in a light most favorable to the State, is available for any rational tier of fact to find Petitioner guilty of the first-degree murder of Pam Willis. Petitioner's multiple admissions come immediately to the forefront." The State argues the evidence makes clear that Petitioner "is anything but actually innocent of the crime ... At best, this case involves a clearly guilty man who hopes to walk free because of the incompetence, or malice, of an Oklahoma City police chemist."

¶ 22 Petitioner goes through the same evidence and argues, "under the standard enunciated in *Jackson v. Virginia*, even in the light most favorable to the State, insufficient evidence exists to sustain the conviction of first-degree murder."

¶ 23 The District Court was not asked to resolve this issue.[28] As the contradictory arguments raised concerning the weight of the evidence against Petitioner demonstrate, reasonable minds could disagree on the question of Petitioner's guilt. While the revelations relating to Ms. Gilchrist are clearly damaging to this largely circumstantial case,

they are not necessarily fatal.[29] Proposition five thus fails.

## DECISION

¶ 24 After carefully reviewing Petitioner's application for post-conviction relief, the briefs of the parties, and the matters addressed at the evidentiary hearing, we find the application has merit, as addressed above. Petition's first-degree murder conviction is therefore **REVERSED,** his death sentence is **VACATED,** and this case is hereby **REMANDED** to the District Court of Oklahoma County for a new trial consistent with this opinion.

CHAPEL, P.J. and C. JOHNSON, J.: concur.

A. JOHNSON, J.: recuse.

---

the important point is that during the guilt stage, the State argued either Appellant or John Doe committed the criminal acts, with the other aiding and abetting.

**28.** Judge Gray is clearly unimpressed by Petitioner's innocence claim: "After Pam Willis was murdered, McCarty was involved in other nasty criminal cases. His participation in another murder and rape are pretty horrific; McCarty is

not a good guy." Judge Gray's order recognized that the new evidence would help the fact-finder "evaluate the totality of the evidence."

**29.** In our opinion with respect to Petitioner's second trial, we noted several times the limited value of hair comparison evidence, finding it neither dispositive nor insignificant. *McCarty,* 1995 OK CR 48, ¶ 8, 904 P.2d at 116.